**SO ORDERED: June 19, 2020.**



_____
**James M. Carr**
**United States Bankruptcy Judge**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| **BRADLEY ALLEN STEPHENSON and** | ) | **Case No. 18-05250-JMC-11** |
| **STACEY LYNN STEPHENSON,** | ) | **Chapter 11** |
| Debtors. | ) | |
| | ) | |
| **AGRIFUND, LLC,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **Adversary No. 18-50221** |
| | ) | |
| **BRADLEY ALLEN STEPHENSON,** | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| **AGRIFUND, LLC,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **Adversary No. 18-50222** |
| | ) | |
| **STACEY LYNN STEPHENSON,** | ) | |
| Defendant. | ) | |

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

These adversary proceedings came before the Court for a trial on November 7, 2019

and January 22, 2020. Plaintiff Agrifund, LLC ("Agrifund") appeared by one or more

employee representatives and counsel James R. Schrier.  Defendants Bradley Allen Stephenson

("Brad") and Stacey Lynn Stephenson ("Stacey") appeared in person and by counsel Ben T. Caughey.  Brad and Stacey are sometimes also referred to herein as the "Stephensons."

By prior agreement of the parties and an order of the Court, Adversary Proceeding No. 18-50221 and Adversary Proceeding No. 18-50222 were tried jointly.  At the conclusion of the second day of trial, the Court took the matter under advisement.  The parties waived submission of post-trial briefs.

The Court, having reviewed the evidence presented at the trial (including Exhibits 1 – 60 offered by Agrifund and Exhibits A – K offered by the Stephensons were admitted into evidence without objection and/or by stipulation) and the other matters of record in these adversary proceedings; having heard the presentations of counsel; having reviewed the proposed findings of fact and conclusions of law timely submitted by the parties; having weighed the credibility of the witnesses; and being otherwise duly advised, now enters the following findings of fact and conclusions of law as required by Fed. R. Civ. P. 52, made applicable to these adversary proceedings by Fed. R. Bankr. P. 7052.

### Findings of Fact

The Court makes the following findings of fact:

1.     Agrifund is a limited liability company duly organized and validly existing under the laws of the State of Delaware and is authorized to conduct business in Indiana.

2.     The Stephensons are residents of Hancock County, Indiana, whose home address at all times relevant hereto was 1016 East 700 North, Fortville, Indiana.

3.     The Stephensons each filed a petition for relief under chapter 11 of title 11 of the United States Code (the "Code")[1] in this Court on July 11, 2018.  In the currently pending

---

[1] All statutory references herein are to the Code unless otherwise noted.

chapter 11 case for Brad and Stacey, they each may achieve a discharge of pre-petition debts (other than debts that are not excepted from discharge under § 523 of the Code) only if they achieve confirmation of a chapter 11 plan. Code § 1141(d).

4.      On August 8, 2018, Agrifund timely filed a *Complaint to Determine Dischargeability of a Debt Pursuant to 11 U.S.C. § 523* (Docket No. 4) (the "Brad Complaint") in Adversary Proceeding No. 18-50221.  Agrifund alleges that Brad owes a judgment debt to Agrifund that is nondischargeable under §§ 523(a)(2)(A), 523(a)(2)(B), and/or 523(a)(6). On August 8, 2018, Agrifund timely filed a *Complaint to Determine Dischargeability of a Debt Pursuant to 11 U.S.C. § 523* (Docket No. 4) (the "Stacey Complaint" ) in Adversary Proceeding No. 18-50222, wherein Agrifund alleged that Stacey owes a judgment debt to Agrifund that is nondischargeable under §§ 523(a)(2)(A), 523(a)(2)(B), and/or 523(a)(6).

5.      The Stephensons timely filed answers to Agrifund's amended complaints on October 3, 2018.

6.      Central Midwest Family Farms, General Partnership ("Central Midwest") is a general partnership organized and existing under the laws of the State of Indiana, with its principal place of business located at 1016 East 700 North, Fortville, Indiana. Central Midwest was formed on or about May 1, 2017, pursuant to the provisions of the Indiana Uniform Partnership Act, I.C. 23-4-1-1.

7.      White River Grain Family Farms, General Partnership ("White River") is a general partnership organized and existing under the laws of the State of Indiana, with its principal place of business located at 1016 East 700 North, Fortville, Indiana. White River was formed on or about May 1, 2017, pursuant to the provisions of the Indiana Uniform Partnership Act, I.C. 23-4-1-1.

8.      Christina D. Stephenson ("Christina") is a resident of Hancock County, Indiana. At all times relevant hereto[2], Christina was a general partner in White River and Central Midwest. Christina stopped working for Central Midwest / White River in December 2017 and was no longer involved in their farm operations thereafter. Christina is the sister-in-law of the Stephensons.

9.      Todd B. Stephenson ("Todd") is a resident of Hancock County, Indiana. Todd is Brad's brother. Todd was a general partner in White River. Todd stopped working for Central Midwest / White River in December 2017 and thereafter was not involved in the farm operations of those entities.

10.     Brad was a general partner in White River and Central Midwest. Stacey was a general partner in Central Midwest. White River and Central Midwest are sometimes referred to herein as a "Borrower" and/or "Borrowers".

11.     Jay Coles was the manager of Agrifund's Indiana office located in Avon, Indiana. Mr. Coles has been in the agricultural lending business since 1982 and has worked with Farmers Home Administration, Farm Credit Services and Wells Fargo Bank. Prior to joining Agrifund he was a loan officer with Rabo Agrifinance, working with its farm loan department.

12.     Shawn Carney ("Carney") was a loan officer employed by Agrifund working out of the Avon office and was Agrifund's loan officer for the loans to Central Midwest and White River. Carney worked for Agrifund as a loan relationship manager from November 2016 through February 2018. Prior to joining Agrifund, he had been a credit analyst for Rabo

---

[2] Unless otherwise indicated, facts and statements pertain to the relevant period of March 1, 2017, through June 30, 2018, which, in general, is the period during which the material interactions between Agrifund and the Stephensons occurred.

Agrifinance, working in its farm loan department.  Carney has been involved in agricultural credit since 2011.  In February 2018, he became employed as a credit finance manager for Co-Alliance LLP working with farm credit accounts.

13.     Prior to 2010, Brad and Todd conducted farming operations as B&T Farms, an Indiana partnership in which Brad and Todd were each 50% general partners.  Brad graduated from the Purdue University Agricultural Short Course in 1991 and has been farming since that time.  Brad has been involved in farming financed, in part, by farm operating loans for more than 25 years.

14.     On or about January 21, 2010, Brad and Stacey, as members, organized six new Indiana limited liability companies (referred to generally as the "Crossroads LLCs").  The Crossroads LLCs were intended to be used in the Stephensons' future farming operations.  The name of each of the Crossroads LLCs begins with "Crossroads Family."  [Ex. 21]

15.     On April 14, 2010, B&T Farms petitioned for bankruptcy relief under Case No. 10-05327-FJO-12.

16.     B&T Farms' chapter 11 case was closed on December 2, 2014.  The amount of unsecured claims discharged without full payment was $1,228,094.59.  Some of the unpaid claims were held by crop input lenders.  [Ex. 10]

17.     B&T Farms transferred certain assets to entities that were owned by Brad, Stacey, Todd and/or Christina, including some of the Crossroads Family LLCs.

18.     Brad, Stacey, Todd and Christina filed individual chapter 7 bankruptcy cases in September 2010 and received discharges of their debts.

19.     Crossroads Family Farms, LLC ("Crossroads LLC") was one of the Crossroads LLCs with a principal place of business at 1016 East 700 North, Fortville, Indiana.

20.     Crossroads Family Farms, GP ("Crossroads GP") is an Indiana general partnership organized prior to 2011 under the laws of the State of Indiana, with a principal place of business at 1016 East 700 North, Fortville, Indiana. Brad, Stacey, Todd and Christina were general partners in Crossroads GP.

21.     In 2016, Central Midwest Farms, General Partnership ("Old Central Midwest") was organized as an Indiana general partnership, with its principal place of business located at 1016 East 700 North, Fortville, Indiana.  Stacey and Christina were each 25% general partners in Old Central Midwest.  The other partners were members of the Emerick family (the "Emericks").  The Emericks were residents of Illinois.

22.     In 2016, White River Grain Farms, General Partnership ("Old White River") was organized as an Indiana general partnership, with its principal place of business located at 1016 East 700 North, Fortville, Indiana.  Todd and Brad was each a 25% general partner in Old White River.  The other partners were Emericks.

23.     More than seven years ago, Stacey began working for some or all of the Crossroads LLCs, and B&T Farms.  Before that, she worked in the finance department of Irving Materials.  She attended Indiana Business College.  Stacey acted as the office manager and was responsible for bookkeeping, accounting and general financial matters for the farm businesses, including the operations of Central Midwest, White River, Old Central Midwest, Old White River and Crossroads GP.  She was responsible for dealing with creditors and lenders.

24.     In 2015, Crossroads GP, as borrower, and Brad, Stacey, Todd, and Christina, as individual guarantors, and certain entities more fully identified in the underlying lending

agreements, borrowed $4,900,000 from First Financial Bank ("FFB"). Various creditors of Crossroads GP subordinated their debts to the claims of FFB. [Ex. 1]

25.     In 2015, Crossroads GP rented and farmed approximately 6,500 acres in central Indiana. Approximately $2,400,000 of the money it had borrowed from FFB was an operating loan to fund the expenses for growing, tending and harvesting its 2015 crops and related operations.

26.     In 2016, Crossroads GP rented and farmed approximately 7,900 acres in central Indiana.

27.     In 2017, Crossroads GP rented and farmed approximately 7,800 acres in central Indiana.

28.     Crossroads GP rented the ground it farmed. Crossroads GP did not own any real estate or equipment.

29.     In 2016, Old Central Midwest and Old White River rented and farmed approximately 13,000 acres in central Indiana. Brad and Stacey, along with the Emericks, were presented with an opportunity to rent those additional 13,000 acres in 2016 during a time that Crossroads GP was renting and farming 7,900 acres. The opportunity arose when another "family farm organization" located south of Indianapolis, Indy Family Farms, was not able to obtain financing to plant and grow a 2016 crop. Eric Richards, a principal of Indy Family Farms, approached the Stephensons and asked them if they would take over and farm Indy Family Farms' rented land. The Stephensons saw an opportunity and decided to partner with some friends, the Emericks. They then set up two new partnerships -- Old Central Midwest and Old White River. Eight individuals were partners in those two partnerships: Brad, Stacey, Todd, and Christina and four Emericks. By including all of those individuals as partners, they

maximized the number of payments they could receive from federal government farm programs.

30.     Old Central Midwest and Old White River, combined, borrowed $3.9 million from FFB to farm the 13,000 acres, or roughly $300 an acre, and produced crops in 2016.  The FFB operating loans would become due after the harvest and were to be paid from grain sales. The FFB loans were repaid.

31.     Old Central Midwest and Old White River did not own land or equipment.  In 2016, they farmed 13,000 acres that they rented from a variety of landlords (the "Landlords"). Old Central Midwest and Old White River had no previous leasing relationships with the Landlords.  The leasing relationships pertaining to that acreage had been with the Richards family.  Old Central Midwest and Old White River did not rent or farm any farmland after 2016.

32.     Old Central Midwest and Old White River ceased business operations because of (1) the death of Tim Emerick (a partner in Old Central Midwest and Old White River who died as a result of a truck accident in October 2016), and (2) the unwillingness of other surviving Emerick family members to sign any documents on behalf of Old Central Midwest or Old White River for the 2017 crop year or to surrender their partnership interests in those entities.

33.     In addition to the unexpected withdrawal of the Emericks, Eric Richards had a nervous breakdown and was no longer involved in farming operations.  Unknown at the time to the Stephensons, Rob Richards told certain of the Landlords that Old Central Midwest and Old White River would not farm those Landlords' ground in 2017 and that a new entity controlled by Rob Richards wished to lease and farm the ground.  As a result, several Landlords changed

their positions about renting their ground to Old Central Midwest and Old White River in 2017. In the spring of 2017, the Stephensons were unaware of this change in the positions of some of those Landlords.

34.     The Stephensons consulted counsel, John Apple, regarding available remedies with respect to Landlords that would not voluntarily fulfill their commitments to lease farmland in 2017 to the successors to Old Central Midwest and Old White River.

35.     Based upon advice of counsel, the Stephensons contacted Landlords to attempt to obtain confirmation of their willingness to allow the successors to Old Central Midwest and Old White River to lease and farm their ground.  After making these contacts in March 2017, the Stephensons concluded that some of the Landlords would lease approximately 5,000 acres to successor entities controlled by the Stephensons.

36.     The unforeseen events of the fall of 2016 caused the Stephensons to scramble to put together a proposed 2017 farming operation to replace the operations conducted in 2016 by Old Central Midwest and Old White River.  To obtain financing for such a 2017 farming operation, they needed to create a viable farming operation to succeed Old Central Midwest and Old White River.  That successor operation would (as the Old Central Midwest and Old White River operation had in 2016) run parallel to and be in many ways integrated with the anticipated 2017 farming operations conducted by Crossroads GP and the related Crossroads LLCs.  Crossroads GP and the related Crossroads LLCs controlled equipment, farm workers, and other resources that would be necessary for any 2017 farming operation that succeeded the 2016 operation of Old Central Midwest and Old White River.  The difficulty of designing a viable 2017 farming operation that would be acceptable to a new lender and the time pressure of doing so to timely begin spring 2017 planting led to enormous confusion and

misunderstandings that caused the farming, lending, and financial failures that are the underlying causes of Agrifund's actions.

37.     In early 2017, Stacey contacted Agrifund to inquire whether Agrifund would provide funding for farming operations conducted on some of the ground that was farmed in 2016 by Old Central Midwest and Old White River.  After these initial discussions, Agrifund advised Stacey that it was interested in providing such funding.

38.     The individuals that primarily communicated regarding the terms of the potential lending relationships between Agrifund and Central Midwest and White River were Stacey (for Central Midwest and White River) and Carney (for Agrifund).

39.     Stacey told Carney that the 2016 operating line provided by FFB to Old Central Midwest and Old White River had not been satisfied.  Carney confirmed Agrifund's knowledge of the unpaid prior obligations to FFB.  He testified that Agrifund would have been comforted by, and relied upon, subordination agreements with a prior lender, like FFB, in such a situation.

40.     As Agrifund was making its lending decisions in the spring of 2017, Stacey told Carney that the Emericks were unwilling to sign any documents for Old Central Midwest or Old White River.

41.     Agrifund and Carney recommended that the Stephensons form new companies that did not include the Emericks, as principals, to address issues related to the withdrawing Emericks.  In response, Central Midwest and White River were organized as the prospective borrowers to succeed some of the 2016 operations of Old Central Midwest and Old White River.

42.     The partners of Central Midwest and related percentages were as follows:

- Brad – 50%

- Christina – 25%

- Stacey – 25%

43.    The partners of White River and related percentages were as follows:

- Christina – 50%

- Brad – 25%

- Todd – 25%

44.    There was a division of responsibilities among Brad, Stacey, Todd, and Christina, which was intended to match the respective individuals' historical roles and skills. Specifically,

(i)    Between May 1, 2017 and July 11, 2018, Brad acted as the general manager for White River and Central Midwest;

(ii)    Between May 1, 2017 and July 11, 2018, Stacey acted as the bookkeeper and accountant for White River and Central Midwest and paid bills for White River and Central Midwest;

(iii)    From May 1, 2017 through the end of his day-to-day involvement with White River and Central Midwest in October 2017, Todd primarily managed the physical farming operations of White River and Central Midwest and maintained some involvement in maintaining "Conservis" reports; and

(iv)    From May 1, 2017 through the end of her day-to-day involvement with White River and Central Midwest in October 2017, Christina assisted in administrative duties including FSA reporting and accounting tasks.

45.    Between March 1, 2017 and May 9, 2017, and prior to the execution of the definitive loan documents between Agrifund, as lender, and Central Midwest and White River as borrowers, the Borrowers provided documents and information to Agrifund.  In addition to the Borrowers' loan applications, the Borrowers provided Agrifund with crop insurance estimated summaries, operating statements, and budget summaries.

46.     In addition to discussing issues related to the form of entities that would comprise the borrowers under the proposed lending arrangement, Stacey and Carney discussed the budgets for the Borrowers' 2017 farming operations.

47.     Carney testified that he was aware of no discussions with Brad related to the budgeting process or the budgets provided and there is no evidence that Brad acted to prepare the Borrowers' budgets.

48.     Stacey provided budgets for the Borrowers that included the anticipated actual expenses of such entities, including such items as equipment rental obligations and employee expenses.

49.     During the pre-lending discussions, Carney educated Stacey on Agrifund's budget process and the concept of budget "buckets".  He told her that a budget for use by Agrifund must contain certain "buckets" in which projected items of expense were placed and that the total amounts allocated to these buckets was to be based upon expected percentages of the total funds to be lent by Agrifund.

50.     The Stephensons (primarily Stacey) repeatedly advised Agrifund that the Borrowers would expend funds to satisfy expenses outside of the budgetary "buckets", including for labor and the use of equipment.  Stacey advised Carney that Crossroads GP would incur expenses that benefited the Borrowers and the Borrowers would need to reimburse Crossroads GP for such expenses.

51.     Agrifund and Carney advised Stacey that it was not material to Agrifund what was paid per the budgets once the lending relationship was approved and implemented.

52.     Agrifund and Carney were aware of, and approved of, the use of Agrifund loan funds to satisfy expenses incurred by Crossroads GP, including for labor and use of equipment.

Carney confirmed that Agrifund approved the use of excess funds from budgeted categories and was aware of the use of funds from budgeted categories to satisfy expenses that were not within specified "buckets". Agrifund told Stacey, in effect, that funds advanced by Agrifund to the Borrowers would be the Borrowers' money, and the Borrowers could use the funds as they wanted regardless of the buckets used in the budgets and draw requests and it was up to the Borrowers to be good stewards of their money.

53.     The Borrowers never owned any farming equipment, land, or livestock, and they never leased any equipment, storage facilities, or livestock from unrelated third parties. Instead, the Borrowers proposed to utilize equipment, farm labor, and other resources owned or controlled by Crossroads GP and related entities. Those entities were conducting their own farming operations parallel to the operations of the Borrowers on other rented farm ground located in a patchwork around Central Indiana. Agrifund was fully aware of these facts at the time that the Agrifund lending agreements were executed and implemented.

54.     Agrifund told Stacey, in effect, that the equipment provided for in the budgets had to be four percent of the total loan amount regardless of what rentals of such equipment would actually cost. Agrifund understood that the equipment expenses of the Borrowers would likely exceed the budgeted amounts and that such expenses would need to be satisfied via other budgeted categories. Further, Agrifund knew that a single labor force would serve the needs of Crossroads GP and related entities and the Borrowers. Agrifund did not consider the use of loan proceeds to satisfy intercompany obligations, among Borrowers and Crossroads GP and related entities, to be prohibited or out of the Borrowers' ordinary course. The use of loan proceeds to satisfy intercompany obligations was understood at the inception of the lending relationship and throughout funding.

13

55.     On May 9, 2017, Agrifund agreed to make a loan to White River in the amount of $706,237.00 (the "White River Loan").

56.     On May 9, 2017, White River executed to Agrifund a Demand Promissory Note which was signed by Christina on behalf of White River; Christina and Todd individually; and Brad and Stacey individually; in the principal sum of $706,237.00 (the "White River Note").

57.     The loan documents executed on May 9, 2017 contained a listing of farms, by county and Farm Service Agency ("FSA") reference number, that the Borrowers believed they had leased from Landlords or subleased from Crossroads GP for the 2017 crop season and on which they would grow crops. The total acres listed was 4,657.

58.     On May 9, 2017, White River executed to Agrifund an Agricultural Security Agreement (the "White River Security Agreement"), which was signed by Christina on behalf of White River; Christina, individually; Brad, individually; and Todd, individually, and which granted Agrifund a security interest in crops (grown on farms listed in the Agreement and a Security Agreement Addendum by FSA number), farm products; all equipment; inventory; assignment of FSA payments; assignment of crop insurance claims, (collectively the "White River Collateral").

59.     On May 9, 2017, White River, by Christina; Christina, individually; Brad, individually; and Todd, individually executed and delivered to Agrifund a Guaranty Agreement ("White River Guaranty"), which unconditionally guaranteed payment when due of all current and future indebtedness of White River.

60.     On May 9, 2017, Agrifund agreed to make a loan to Central Midwest in the amount of $1,459,100.00 (the "Central Midwest Loan").

61.     On May 9, 2017, Central Midwest delivered to Agrifund a certain Demand Promissory Note which was executed by Brad on behalf of Central Midwest; Brad, individually; Christina, individually; and Stacey, individually in the principal sum of $1,459,100.00 (the "Central Midwest Note").

62.     On May 9, 2017, Central Midwest delivered to Agrifund an Agricultural Security Agreement (the "Central Midwest Security Agreement"), which was signed by Brad on behalf of Central Midwest; Brad, individually; Christina, individually; and Stacey, individually, and which granted Agrifund a security interest in crops (grown on farms listed in the Agreement and Security Agreement Addendum by FSA number), farm products; all equipment; inventory; assignment of FSA payments; assignment of crop insurance claims, (collectively the "Central Midwest Collateral").

63.     On May 9, 2017, Central Midwest, by Brad; Brad, individually; Christina, individually; and Stacey, individually executed and delivered to Agrifund a Guaranty Agreement (the "Central Midwest Guaranty"), which unconditionally guaranteed payment when due of all current and future indebtedness of Central Midwest.

64.     The FSA farm numbers included on the Security Agreements were given to Agrifund by the Borrowers.

65.     Central Midwest and White River incurred the expense of performing tillage on the land included in the Security Agreements in preparation for farming for 2017.

66.     While Central Midwest and White River expected to farm approximately 4,589 acres, in fact, in 2017 White River and Central Midwest farmed and received income from crops grown on approximately 1,667 acres.  It is unclear when Borrowers and the Stephensons became aware that the Borrowers were farming many fewer acres than they had anticipated,

but they did not become fully aware of the real acreage until Agrifund had advanced most, if not all, of the loan proceeds.

67.    On May 9, 2017, the Borrowers provided to Agrifund forms entitled "no written lease" list (the "Lease List").  The Lease List identified farms containing total tillable acreage of 4,589 acres that Borrowers believed that they had cash rented from Landlords for the 2017 crop year.  The Lease List included the FSA reference numbers for farms listed therein.  All of the farms listed on the Lease List were farms that  Old Central Midwest and Old White River had rented in 2016.

68.    The Lease List for White River was signed by Christina and the Lease List for Central Midwest was signed by Brad.

69.    The Lease List was prepared by Agrifund.  The Lease List indicated that "no written leases pertaining to 100% of the cash rented acres" existed.

70.    The decisions of many of the Landlords to use other farming operators to rent and work their ground in 2017 were not known to the Stephensons in the spring of 2017.

71.    Agrifund had the ability to independently request FSA Form 578 disclosures directly from the FSA and did not do so.  Form 578 would have indicated which farms were actually registered with the FSA as having been planted by the Borrowers.  Agrifund had the ability to speak with the crop insurance agent utilized by the Borrowers to obtain information about the acreage available to and actually planted by the Borrowers.  The status of audits of Old Central Midwest and Old White River did not impair Agrifund's ability to obtain full and complete information from FSA or the crop insurance agent.

72.    Agrifund was the payor of all checks made payable to and tendered directly to Landlords.  Agrifund's corporate office in Dallas, Texas would advise Carney of checks made

payable and tendered to Landlords that Landlords had failed to present for payment. Over several months, Agrifund became aware that many Landlords had not cashed the checks that Agrifund has sent to them as the Borrowers' tendered rent payment. The Stephensons became aware that certain Landlords refused to cash the checks by being advised of such refusal by Agrifund.

73.    Stacey and Carney communicated in writing and by telephone about uncashed checks payable to Landlords. Stacey advised Agrifund of situations where Landlords that had been sent rent checks found other operators to farm their ground and therefore did not cash the proffered rent checks.

74.    Agrifund made no adjustments to the amount of funds advanced after learning that Borrowers would actually plant fewer acres than they originally intended to farm. Agrifund suggested to Stacey that changes in the number of available acres could be addressed or accounted for later. Agrifund failed to prove that the decision of some Landlords to withhold their ground from Central Midwest and White River reduced the amount of funds to be advanced or the lending decisions of Agrifund after the inception of the lending arrangement.

75.    After the closing of the lending arrangement, the Borrowers made draw requests to Agrifund seeking use of the funds that Agrifund agreed to advance.

76.    Stacey completed the draw requests and transmitted the requests to Agrifund.

77.    The draw requests transmitted to Agrifund were completed in a manner and form consistent with the discussions between Stacey and Carney and utilized the Agrifund "buckets" regardless of the actual use by the Borrowers of the funds advanced.

78.     The Stephensons believed that the funds advanced by Agrifund, regardless of their categorization by "bucket", were used only for Borrowers' farming operations.

79.     The Stephensons frequently satisfied intercompany obligations of Borrowers to Crossroads GP and the related entities.  Doing so was ordinary in terms of the way that their farming operations were conducted over the years.

80.     Stacey testified that she discussed with Carney the satisfaction of obligations due to Crossroads GP by Borrowers as well as the satisfaction of obligations due to Borrowers by Crossroads GP.  Carney did not dispute that he discussed such matters with Stacey.  In fact, Carney did not dispute advising Stacey that the satisfaction of obligations owed by Borrowers to Crossroads GP was acceptable and that the funds could simply be allocated from an unused "bucket".

81.     During 2017, Crossroads GP frequently satisfied obligations of Borrowers and Borrowers frequently satisfied obligations of Crossroads GP.

82.     After the intercompany transactions between Crossroads GP and Borrowers were netted out, the books and records of Crossroads GP, White River, and Central Midwest indicate that certain of Central Midwest and White River funds were used to satisfy obligations owed by Crossroads GP and those amounts remain unsatisfied.

83.     Separate and apart from the unpaid intercompany obligations, $243,698.71 of grain representing White River Collateral and Central Midwest Collateral (collectively the "Collateral") was mistakenly sold in the name of Crossroads GP.   The proceeds were used in the spring of 2018 by Crossroads GP.  Crossroads GP filed a chapter 11 bankruptcy case on July 11, 2018 and has not reimbursed Agrifund with respect to proceeds from the sale of Collateral.

84.     In 2017 Central Midwest, White River, and Crossroads GP used a computer program from a company called "Conservis" which tracks yields and bushels by field.  This program was also used in 2016 by Old Central Midwest, Old White River, and Crossroads GP.

85.     Neither Brad nor Stacey were responsible for the information included in the Conservis computer program nor aware that the information was faulty – as the parties later discovered.

86.     The grain contracts under which the $243,689.71 of grain collateral were sold were held by Crossroads LLC and grain was sold in the ordinary course and not as an attempt to convert Agrifund's Collateral, prop up operations of entities other than the Borrowers, or generate cash outside of the ordinary course.

87.     On behalf of the Borrowers and other entities related to the Stephensons, Brad determined when crops would be sold to maximize value and where the crops would be sold. Brad testified that by selling the crops under pre-existing contracts in the name of Crossroads LLC, Brad believed that he was maximizing the value of the Collateral.  There is no evidence that Stacey affirmatively participated in the sale of Collateral or the decisions related to when to sell the grain, where to sell the grain, and under what contracts the grain would be sold.

88.     As of July 12, 2018, Agrifund had advanced loan proceeds totaling $362,708.60 to White River and had received no repayments.  Accrued Interest as of that date totaled $41,377.62.

89.     As of August 12, 2018, Agrifund had advanced loan proceeds totaling $905,799.20 to Central Midwest and had received $523,939.10 of principal repayments, leaving $384,860.10 principal outstanding.  Accrued Interest as of that date totaled $27,431.16.

90.    On August 7, 2018, Agrifund commenced actions seeking determination of the dischargeability of debts under Section 523 of the Bankruptcy Code in the cases of Brad Stephenson, Stacey Stephenson, Todd Stephenson, and Christina Stephenson.

91.    The adversary proceedings commenced by Agrifund against Todd and Christina have been dismissed.

## Conclusions of Law

1.    Any finding of fact above will also be a conclusion of law, and any conclusion of law will also be a finding of fact to support the judgment of the Court.

2.    This Court has jurisdiction over the subject matter of the Agrifund's complaints pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(I) and 11 U.S.C. § 523.

3.    The Court has jurisdiction over the parties in these adversary proceedings.

4.    Each of the parties to these adversary proceedings consented to entry of final orders or judgment by the Court pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure.

5.    One of the fundamental purposes of bankruptcy is to provide debtors with a fresh start by discharging pre-petition debts.  *See, In re Jahrling*, 816 F.3d 921, 924 (7th Cir. 2016) and *In re Zarzynski*, 771 F.2d 304, 306 (7th Cir. 1985) ([t]o further the policy of providing a debtor a fresh start in bankruptcy, "exceptions to discharge are to be construed strictly against a creditor and liberally in favor of the debtor.").

6.    A party seeking to establish an exception to the discharge of a debt bears the burden of proof.  *In re Martin*, 698 F.2d 883, 887 (7th Cir. 1983).  The United States Supreme Court held that the standard of proof to establish an exception to discharge is a preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279, 285, 111 S. Ct. 654, 659, 112 L.Ed.2d 755

(1991).

<u>Count I – Whether Brad or Stacey Made a False Written Statement Upon Which Agrifund
Relied Related to the Amount of Real Property to Be Farmed by Borrowers.</u>

7.    Count I of the Agrifund's complaints ("Count I") alleges that the Stephensons

violated § 523(a)(2)(A) and § 523(a)(2)(B) by making false written statements to Agrifund at

the time of the execution of the Agrifund lending documents.

8.    In order to prevail upon Count I, Agrifund was required to establish by a

preponderance of the evidence that:

> (i)    the Stephensons represented that Central Midwest and White River
> would farm and grow crops on approximately 4,658 acres in 2017;
>
> (ii)    the Stephensons understood and knew that Central Midwest and White
> River would be required to notify Agrifund if the acres to be planted by
> such entities changed;
>
> (iii)    the Security Agreement of Agrifund and exhibits thereto were written
> statements representing the financial condition of Central Midwest and
> White River with respect to the anticipated 2017 crops;
>
> (iv)    the Stephensons made such written representations knowing at the time
> that White River and Central Midwest would not farm the number of
> acres indicated in the Lease List; and
>
> (v)    Agrifund relied upon the Stephensons' representations.

9.    The Seventh Circuit has determined that in order for a claimant to succeed on a

claim under § 523(a)(2)(B), the claimant must "prove that the debtor made a materially false

written statement about [or a related entity's] his financial condition with the intent to deceive,

and that the creditor reasonably relied on the statement." *In re Cohen*, 507 F.3d 610, 612 (7th

Cir. 2007).

10.    Agrifund failed to meet its burden of establishing that either of the Stephensons

made a materially false written statement with the intent to deceive Agrifund.

11.    The evidence presented at trial failed to establish that the Stephensons did not believe in good faith at the time of execution of the Agrifund lending agreements that Borrowers would farm the rented ground identified in the Lease List.  In fact, Central Midwest and White River incurred the expense of performing tillage on the land described in the Lease List in preparation for farming, which supports the Stephensons' assertions that they believed on May 9, 2017 that the acres identified in the Lease List would, in fact, be farmed by Borrowers.

12.    The individual decisions of many prior Landlords to use other farming operators to work their ground in 2017 were not known to the Stephensons at the times material to Agrifund's Count I.  Agrifund failed to establish that the Stephensons knew that Borrowers would be unable to farm such ground at any relevant time.

13.    The evidence fails to establish that the Stephensons did not believe in good faith that the Borrowers would farm the acres identified in the Lease List.  The Lease List does not contain a knowing false representation by either of the Stephensons.

Count II – Whether the Stephensons Committed Actual Fraud, Caused Willful and Malicious Injury, or Acted with False Pretenses Related to Use of Funds Outside of Agrifund's "Buckets" or By Failing to Disclose Changes in Acres to Be Planted.

14.    Count II of the Agrifund's complaints ("Count II") alleges that the Stephensons violated § 523(a)(2)(A) and § 523(a)(6) by committing actual fraud, causing willful and malicious injury, and/or acting with false pretenses related to the Borrowers' requests for advances.

15.    Count II alleges that the Stephensons violated § 523(a)(2)(A) and § 523(a)(6) by committing actual fraud, causing willful and malicious injury, and acting with false pretenses related to the Stephensons' alleged failure to disclose any changes in the amount of acres to be

farmed by the Borrowers.

16.    In order to prevail upon Count II, Agrifund was required to establish by a preponderance of the evidence that:

    (i)    the Stephensons made representations that loan funds would be used for specific purposes as outlined by the budgets;

    (ii)    the Stephensons intentionally and falsely caused Borrowers to use funds for purposes not permitted by Agrifund's loan documents;

    (iii)    the Stephensons made representations in the form of draw requests knowing at the time that there had been a material change in the intended acres to be planted which materially impacted the requests made;

    (iv)    the Stephensons made such representations knowing them to be false and with the intent of inducing Agrifund to make the advances; and

    (v)    Agrifund relied upon the false representations.

17.    In *Kawaauhau v. Geiger*, 523 U.S. 57 (1998), the Supreme Court held that § 523(a)(6) requires a willful injury – one that is voluntary or intentional.  Negligently or recklessly inflicted injuries are insufficient to support an exception to discharge.

18.    In *First Weber Group, Inc. v. Horsfall*, 738 F.3d 767 (7th Cir. 2013), the Seventh Circuit identified three elements to a § 523(a)(6) claim:

    (1)    an injury [to the creditor or his property] caused by a debtor;

    (2)    willfully; and

    (3)    maliciously.

The court explained that in proving a "malicious" injury the creditor did not need to prove "ill-will or specific intent to do harm." *Id*. at 774-75.  But in proving a "willfulness," the creditor must prove not just an intentional act, but also an actual intent by the debtor to injure.  *Id*. at 774; *see also Gerard v. Gerard*, 780 F.3d 806, 811 (7th Cir. 2015) ("one must act with the specific intent to cause a certain result in order to prove willfulness."); *see also  In re Scarlata*,

979 F.2d 521, 526 (7th Cir. 1992) (holding that a creditor must show that the debtor knew his acts would automatically or necessarily cause the creditor's injury).

19.    Agrifund failed to meet its burden of establishing that the Stephensons committed actual fraud or caused willful and malicious injury to Agrifund related to Borrowers' use of loan proceeds.

20.    Consistent with Seventh Circuit precedent, in order to prevail upon the claims pled in Count II, Agrifund was required to prove that the Stephensons had an intent to inflict injury to Agrifund related to the use of loan proceeds outside of the budgeted categories identified by Agrifund or by failing to disclose a material reduction in acres to be planted.

21.    Among other things, no evidence was presented that either of the Stephensons converted funds to his or her own personal use.  No evidence supports the conclusion that either of the Stephensons intended to defraud or otherwise harm Agrifund.  Fraudulent intent cannot be logically inferred by conduct of the Stephensons.

22.    Nor does evidence establish that the Stephensons committed actual fraud whether by knowingly acting or knowingly assisting in a collusive scheme to use loan proceeds for improper purposes or otherwise.

23.    Finally, viewing the evidence relating to the Stephensons' knowledge of the reduction in acres to be planted, the timing of the Stephensons' knowledge of such changes, and the communications between Agrifund and Stacey related to reduction in acres fails to establish that the Stephensons engaged in actual fraud or caused willful and malicious injury.

Count III – Whether the Stephensons Committed Actual Fraud, Caused Willful and Malicious Injury, and Acted with False Pretenses Because of the Transfer of Approximately $470,000 of Loan Proceeds.

24.    Count III of the Agrifund's complaints ("Count III") also alleges that the

Stephensons violated § 523(a)(2)(A) and § 523(a)(6) by committing actual fraud, causing willful and malicious injury, and acting with false pretenses related the transfer of approximately $470,000 of loan advances to Crossroads LLC.

25.    In order to prevail upon Count III, Agrifund was required to establish by a preponderance of the evidence that:

    (i)    the Stephensons caused Borrowers to obtain advances of approximately $470,000 by intentionally misrepresenting and falsely stating that the funds would be used for White River and Central Midwest operating expenses and inputs,

    (ii)    the Stephensons intentionally caused Borrowers to transfer $470,000 of loan proceeds to Crossroads LLC,

    (iii)    the transfer to Crossroads LLC was without Borrowers' receiving any, or a reasonably equivalent value for the transfer,

    (iv)    the Stephensons had a duty and obligation to Agrifund to see that the funds advanced by Agrifund were used for proper and authorized purposes,

    (v)    the Stephensons caused the transfer of approximately $470,000 to hinder and impair Agrifund's ability to collect on its debt; and

    (vi)    Agrifund was injured by the transfer.

26.    Agrifund failed to meet its burden of proving that the Stephensons caused Borrowers to obtain advances by intentionally misrepresenting or falsely stating the intended uses of the funds or that the Stephensons transferred such funds to hinder and impair Agrifund's ability to collect on its debts.

27.    The fact that there was one labor force serving the needs of Crossroads GP, and related entities, and the Borrowers was understood by Agrifund.  Notably, the satisfaction of intercompany obligations was understood at the inception of the lending relationships and throughout funding and either tacitly, or expressly, approved by Agrifund.

28. The evidence presented fails to establish that the Stephensons knew at the time that White River and Central Midwest loan funds were used to satisfy obligations of Crossroads GP, or related entities, that such funds could not or would not be repaid.

29. The evidence presented also fails to establish that the Stephensons intended to convert Agrifund's Collateral or deprive Agrifund of its property.

<u>Count IV – Whether the Stephensons Caused Willful and Malicious Injury Related to the Transfer of Approximately $244,000 of Grain to Crossroads LLC.</u>

30. Count IV of the Agrifund's complaints ("Count IV") also alleges that the Stephensons violated § 523(a)(6) by causing willful and malicious injury related to Agrifund by converting Agrifund's Collateral.

31. In order to prevail upon Count IV, Agrifund was required to establish by a preponderance of the evidence that:

(i) approximately $244,000 of grain comprising Agrifund Collateral was sold in the name of Crossroads LLC;

(ii) the Stephensons had a duty to protect and preserve the grain proceeds for the benefit of Agrifund;

(iii) the Stephensons willfully and maliciously transferred the grain proceeds to Crossroads LLC with the intent of depriving Agrifund of the same;

(iv) the Stephensons made the transfer of the grain proceeds to Crossroads LLC with the intent to hinder and impair Agrifund's ability to collect on its debt; and

(v) Agrifund was injured by the transfer.

32. Agrifund failed to meet its burden of establishing that the Stephensons willfully and maliciously transferred the proceeds of Collateral to Crossroads LLC with the intent of depriving Agrifund of such funds and with the intent to hinder and impair Agrifund's ability to collect on its debt.

33.    While a person is held to have intended all consequences that are substantially certain to result from his actions, this is not the same thing as having an intent to inflict injury, as required to sustain a nondischargeability complaint under § 523(a)(6).

34.    The evidence presented fails to establish that the Stephensons knew at the time of the sale of the $243,698.71 in grain that the Borrowers were selling Collateral, but instead mistakenly relied upon faulty information contained in the Conservis reports as to which entity owned the grain.

35.    The evidence presented fails to establish that the Stephensons knew at the time of the Borrowers' sale of the $243,698.71 in grain that Crossroads LLC and/or the Borrowers could not repay Agrifund.

<u>Count V – Whether the Stephensons Committed Actual Fraud, Caused Willful and Malicious Injury, and Acted with False Pretenses Because of the Transfer of Leasehold Rights of Central Midwest and White River</u>.

36.    Count V of the Agrifund's complaints ("Count V") also alleges that the Stephensons violated § 523(a)(2)(A) and § 523(a)(6) by committing actual fraud, causing willful and malicious injury, and acting with false pretenses related to the transfer of leasehold rights, as a tenant, derived from the Landlords to other entities to the detriment of Agrifund.

37.    In order to prevail upon Count V, Agrifund was required to establish by a preponderance of the evidence that:

(i)    the Stephensons caused the lease rights of Borrowers to farm real property in 2017 to be conveyed to other entities;

(ii)    the value of the leasehold rights comprised Agrifund's Collateral;

(iii)    the Stephensons had an affirmative duty to Agrifund to protect and preserve the leasehold rights; and

(iv)    Agrifund was injured by the transfer of leasehold rights.

38.     Agrifund failed to meet its burden of establishing that the Stephensons committed actual fraud, caused willful and malicious injury, or acted with false pretenses related to the transfer of leasehold rights of the Borrowers.

Count VI – Whether the Stephensons Committed Actual Fraud, Caused Willful and Malicious Injury, and Acted with False Pretenses by Concealing and/or Disposing of Agrifund's Collateral.

39.     Count VI of the Agrifund's complaints ("Count VI") also alleges that the Stephensons violated § 523(a)(2)(A) and § 523(a)(6) by committing actual fraud, causing willful and malicious injury, and acting with false pretenses by allegedly intentionally and wrongfully concealing and/or disposing of Agrifund's Collateral to the detriment of Agrifund.

40.     In order to prevail upon Count VI, Agrifund was required to establish by a preponderance of the evidence that:

(i)     the Stephensons interfered with Agrifund's right to its Collateral by deliberately concealing the location of the Collateral or disposing of the Collateral;

(ii)     the Stephensons intended to improperly use the Collateral and its proceeds for purposes other than paying Agrifund;

(iii)     the Stephensons improperly used the Collateral and its proceeds for purposes other than paying Agrifund; and

(iv)     that Agrifund was injured by the Stephensons' actions.

41.     Agrifund failed to meet its burden of establishing an entitlement to relief under Court VI and the evidence presented fails to establish that the Stephensons intended to take, or in fact took, any actions with an intent to conceal or wrongfully dispose of Agrifund's Collateral.

### <u>Decision</u>

Based on the foregoing, the Court hereby concludes that the debt owed by the Stephensons to Agrifund is not excepted from discharge pursuant to §§ 523(a)(2)(A), 523(a)(2)(B), and/or 523(a)(6).

The Court will enter judgment consistent with these findings of fact and conclusions of law contemporaneously herewith.

###